**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re 360 DigiTech, Inc. Securities Litigation | No. 1:21-cv-06013-AKH<br><br>Judge Alvin K. Hellerstein<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT 360 DIGITECH, INC.'S MOTION TO DISMISS THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 3

    A. 360 DigiTech's Loan Facilitation Business Hinged on Access to Large Amounts of Personal Data ...................................................................................................... 3

    B. 360 DigiTech was Required to Comply with Chinese Regulations When Collecting and Storing Customer's Personal Information ........................................................... 4

    C. Despite Violating Chinese Data Privacy Regulations Throughout the Class Period, Defendants Assured the Market of Their Compliance ........................................ 7

    D. Government Regulators Warn 360 DigiTech of Its Non-Compliance .............................. 8

    E. The Truth Begins to Emerge as Chinese Regulators Reveal 360 DigiTech's Violations and Ultimately Remove the 360 Jietiao App from App Stores .......................................... 9

III.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE ACTIONABLE MATERIAL MISSTATEMENTS AND OMISSIONS ......................... 11

    A. Throughout the Class Period, 360 DigiTech Violated Chinese Data Privacy Laws in Existence Since as Early as 2011 ...................................................................... 11

    B. The Company's Purported Risk Warnings Were Insufficient to Counterbalance the False Nature of Their Repeated Positive Statements Regarding Data Privacy .......................... 14

    C. The Alleged Misstatements Are Not Inactionable Puffery ............................................... 15

    D. Because 360 DigiTech Chose to Speak on Its Regulatory Compliance and Data Collection Practices, It Had a Duty to Speak the Full Truth ........................................... 17

IV.   THE COMPLAINT ADEQUATELY ALLEGES A STRONG INFERENCE OF SCIENTER .......................................................................................................... 18

    A. Data Privacy Regulations and the 360 Jietiao App Were Critical to 360 DigiTech's Core Operations—Supporting a Strong Inference of Scienter ...................... 19

    B. Defendants' Statements Themselves Support a Strong Inference of Scienter .................. 21

    C. The Strong Inferences of Scienter Alleged Are At Least As Compelling as Any Opposing Inferences of Nonfraudulent Intent ................................................................ 23

V.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION.......................... 23

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)............................................................................................16

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021)............................................................................19

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)............................................................................20

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)............................................................................17

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)..............................................................................17

*Boston Retirement System v. Alexion Pharmaceuticals, Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)........................................................................18, 21

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)............................................................................................24

*Cheng v. Canada Goose Holdings Inc.*,
2021 WL 3077469 (S.D.N.Y. July 19, 2021) ................................................................20

*Christine Asia Co. Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ......................................................................................11

*City of Pontiac General Employees' Retirement
System v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................21, 22

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ...........................................................................13

*Financial Guaranty Ins. Co. v. Putnam Advisory Co.*,
783 F.3d 395 (2d Cir. 2015).............................................................................................25

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................................15

*Gauquie v. Albany Molecular Research, Inc.*,
2016 WL 4007591 (E.D.N.Y. July 26, 2016)................................................................21

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................................19

*IBEW Local Union No. 58 Pension Trust Fund &*
   *Annuity Fund v. Royal Bank of Scotland Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015)................................................................................16

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)..................................................................................20

*KBC Asset Mgmt. NV v. MetLife, Inc.*,
   2022 WL 480213 (2d Cir. Feb. 17, 2022)..........................................................1, 11

*In re Longtop Financial Technologies Ltd. Sec. Litig.*,
   910 F. Supp. 2d 561 (S.D.N.Y. 2012)..................................................................18

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)..............................................................................3, 23

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)................................................................................17

*In re MF Global Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................15

*New Orleans Employees Retirement System v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ...........................................................................20

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................13, 20

*Oklahoma Firefighters Pension & Retirement System v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)....................................................................19

*In re Omega Healthcare Investors, Inc. Sec. Litig.*,
   2021 WL 4443562 (S.D.N.Y. Sept. 28, 2021)...................................................23, 24

*In Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................16

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014),
    *overruled on other grounds by*
    *City of Dearborn Heights Act 345 Police & Fire*
    *Retirement System v. Align Technology, Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...............................................................................22

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)...................................................................................20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...................................................................................18

*In re Security Capital Assurance, Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)...................................................................21

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................................................18

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010)....................................................................................2

*Smith v. Foster*,
    168 F. Supp. 3d 654 (S.D.N.Y. 2016)....................................................................23

*South Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)..........................................................22, 23

*In re Synchrony Financial Sec. Litig.*,
    2022 WL 427499 (D. Conn. Feb. 11, 2022) ..........................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................2, 18

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..............................................................................15, 16

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................18

*Zheng v. Pingtan Marine Enterprise Ltd.*,
    379 F. Supp. 3d 164 (E.D.N.Y. 2019) ...................................................................20

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)..................................................................................18

Lead Plaintiff Gad Sorek ("Sorek" or "Plaintiff") respectfully submits this memorandum of law in opposition to Defendant[1] 360 DigiTech, Inc.'s Motion to Dismiss the Amended Consolidated Class Action Complaint (ECF No. 45) (the "Motion" or "MTD").[2]

## I.    INTRODUCTION

In the end, even a generous reading of Defendants' MTD confirms that 360 DigiTech violated Chinese data privacy law by over-collecting its customers' personal data, all the while telling investors the exact opposite.  Nowhere in their brief do Defendants deny that they violated Chinese data privacy laws.  Nor could they—at the end of the Class Period, the Company admitted to doing just that.  Instead, knowing they cannot deny illegally collecting personal customer data, Defendants creatively (and conveniently) create an entirely new and self-serving factual narrative that unsurprisingly absolves them of all liability.  However, Defendants' attempts to spin the facts should be rejected.  First, to do so runs afoul of the uncontroversial-but-essential rule that courts must "accept as true all factual allegations" in the Complaint.  *KBC Asset Mgmt. NV v. MetLife, Inc.*, 2022 WL 480213, at *1 (2d Cir. Feb. 17, 2022).  Second, and more importantly, Defendants' hand-selected facts from outside the four corners of the Complaint do not magically render true their otherwise false statements regarding 360 DigiTech's purported top-of-industry compliance with Chinese data privacy regulations.[3]

For example, Defendants attack Plaintiff's falsity allegations by arguing that 360 DigiTech

---

[1] The Individual Defendants, Haisheng Wu, Jiang Wu, Zuoli "Alex" Xu, and Hongyi Zhou, reside in the People's Republic of China ("China").  Plaintiff is in the process of serving them in accordance with the provisions of Article 5 of the Hague Convention of November 15, 1965, on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague").  Plaintiff will inform the Court when service through the Hague is effectuated.

[2] Capitalized terms herein have the same meaning as set forth in the Amended Class Action Complaint for Violations of Federal Securities Laws (ECF No. 41) (the "Complaint").  Citations to "¶ __" refer to paragraphs of the Complaint. References to "MTD at __" are to the memorandum of law in support of Defendants' Motion (ECF No. 46).

[3] Concurrently herewith, Plaintiff has filed a motion to strike Defendants' improper references to facts outside those alleged in the Complaint.

did not begin to violate Chinese data privacy regulations until May 1, 2021, over a year into the Class Period.  MTD at 17–20.  However, the Complaint makes clear that 360 DigiTech's data collection practices violated not only the May 1, 2021 regulation, but also three other Chinese data privacy laws *in place years well before the beginning of the Class Period*.  Defendants also insist that they negate falsity because they ostensibly disclosed to investors in the Company's annual report the risks associated with the Chinese data privacy laws.  MTD at 14–15.  But Defendants' supposed warnings that regulators "may" find the Company is in violation of data privacy regulations were useless to investors when Defendants knew *at that time* the Company already had violated such data privacy regulations—especially in light of Defendants' repeated guarantees to the contrary.

Defendants also argue that each misstatement amounts to inactionable puffery.  MTD at 20–22.  However, because Defendants' statements guaranteed the Company's compliance—and investors understood the Company's compliance was crucial to its ability to generate revenue— the alleged misstatements are far more than the mere corporate optimism Defendants claim.

Defendants further try to rebut Plaintiff's scienter allegations by arguing they had no direct knowledge of the Company's illegal data collection practices.  But Defendants' piece-meal scienter argument ignores the well-settled law that scienter must be viewed in a holistic manner. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("the court's job is not to scrutinize each [scienter] allegation in isolation but to assess all the allegations holistically"); *Slayton v. Am. Express Co.*, 604 F.3d 758, 775 (2d Cir. 2010) (same).  Indeed, the Complaint adequately alleges Defendants' knowledge of these data collection practices (i) because the 360 Jietiao app was the Company's self-described "core product" and primary source of revenue; (ii) through the fact that Defendants' statements themselves indicated their knowledge of the

2

Company's data privacy practices; and (iii) through the fact that Defendants were aware of a crackdown by the Chinese government on illegal data collection by Chinese Fintech companies such as 360 DigiTech. When viewed holistically, the Complaint alleges a strong inference of scienter.

Finally, Defendants contest loss causation by pointing to a variety of unrelated regulatory events, which Defendants unilaterally posit were the real cause of investors' losses. However, the Complaint's allegations related to 360 DigiTech's regulatory violations and the removal of its primary revenue source for violating Chinese data privacy laws adequately establish "'some indication' of the actual loss suffered and [] a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). That is all that is required at the motion to dismiss stage.

The Court should deny Defendants' motion to dismiss.

## II.   STATEMENT OF FACTS

### A. 360 DigiTech's Loan Facilitation Business Hinged on Access to Large Amounts of Personal Data

Headquartered in Shanghai, China, 360 DigiTech is one of the largest consumer lending platforms in China. ¶ 50. 360 DigiTech facilitates consumer loans through what it described as its "core product," the 360 Jietiao app. ¶ 49. Like most major mobile applications, the 360 Jietiao app is available for Chinese consumers to download through app stores including 360 Group's app store, Tencent app bao, Huawei app market, and Xiaomi app market. ¶ 52. Once consumers download the app and apply for a loan, 360 DigiTech matches consumers with financial institutions willing to give them the loan. ¶ 51. The Company then generates revenue from these loans by charging various fees for its services, including loan facilitation and service fees, whereby

3

the Company receives a fee based on a percentage of the principal of each loan. *Id.*

As part of the services, 360 DigiTech runs background analyses on each potential borrower to aid the lending institution in determining whether to lend to the applicant. ¶ 53. The Company conducts these analyses by utilizing "thousands of data points" and over 3,000 variables on each potential borrower. *Id.* According to 360 DigiTech, the Company's ability to aggregate large amounts of data not only generated revenue but also differentiated it from competitors. ¶ 54. For example, in the Company's 2019 Form 20-F it stated: "large volumes of high quality data differentiate online consumer lending platforms, and *we have a meaningful competitive advantage based on our proprietary data collection abilities, our collaboration with 360 Group and other third-party providers*." *Id.* The Company doubled down on this statement in its 2020 Form 20-F stating: *"[l]arge volumes of high-quality data is a <u>key factor</u> differentiating online finance platforms. We have gained a considerable competitive advantage with our proprietary data collection, processing, and analyzing capabilities*." *Id.*

### B. 360 DigiTech was Required to Comply with Chinese Regulations When Collecting and Storing Customer's Personal Information

In order to protect consumers participating in the Chinese consumer lending market, the Chinese government has implemented a series of regulations regulating how Fintech companies, such as 360 DigiTech, may collect, store, share, and analyze consumer's personal information. ¶ 57. 360 DigiTech acknowledged the importance of its complying with these regulations, stating that "maintain[ing] the highest standard of compliance in line with the latest regulations" was "*critical* for healthy and sustainable development of our business." ¶ 70.

Over the course of a ten-year period before the Class Period, between 2011 and 2021, Chinese regulators implemented numerous regulations with which 360 DigiTech was required to comply. ¶ 57. Critically, the regulations specifically required that 360 DigiTech obtain users'

consent before collecting and storing their personal data. *Id.* For example, a decade before the Class Period, in 2011 the Ministry of Industry and Information Technology of the People's Republic of China (the "MIIT") promulgated "Provisions on Standardizing the Internet Information Service Market." Article 11 of these provisions prohibits companies from collecting personally identifiable information or providing such information to third parties without the users' consent. ¶ 58. Similarly, on November 7, 2016, four years before the Class Period, the Chinese government promulgated the Cyber Security Law. ¶ 59. According to Article 41 of the Cyber Security Law, companies must comply with the principals of legality, rationality, and necessity in collecting and using personal information; must publicize the rules of collection and use; must explicitly articulate the purpose, means, and scope of the collection of a person's information; and must obtain the information owner's consent to use or collect such information. *Id.*

Though the above regulations were enacted to protect consumer's data from misuse by Fintech companies like 360 DigiTech, in 2019 the Chinese government nonetheless engaged in a data privacy "crackdown" in response to "the rampant collection of personal information through coercive permission, excessive requests of permission or beyond the approved scope, and the use of personal information in violation of laws and regulations by [a]pps" which "ha[d] been a prominent issue, and a cause of grave concern for many [i]nternet users." ¶ 61. Just over a year before the Class Period, on January 25, 2019, the Cyberspace Administration of China, the MIIT, the Ministry of Public Security, and the State Administration of Market Regulation jointly issued an "Announcement on Carrying Out Special Rectification on the Collection and Use of Personal Information by Apps in Violation of Laws and Regulations." ¶ 60. In the announcement, Chinese regulators reiterated that laws then-currently in effect, including specifically the Cyber Security Law, protected app users' personal information, explaining that "[w]hen collecting and using

5

personal information, [a]pp . . . shall follow the principles of legality, legitimacy and necessity, and not collect personal information irrelevant to the services provided; . . . and obtain the independent consent of the subjects of personal information[.]" ¶ 61.

The announcement went on to declare that "[p]unishment shall be imposed for the acts of coercive and excessive collection of personal information, collection and use of personal information without the consent of consumers and the agreement between both parties in violation of laws and regulations[.]" ¶ 62. Potential punishments included "suspending relevant business [and] stopping business for rectifications" (*id.*), the exact punishments that were ultimately imposed on 360 DigiTech as a result of its violations.

The crackdown ultimately led to the promulgation of a series of rules reinforcing the previously implemented protections against the misuse and over-collection of consumers' personal information—to all of which 360 DigiTech was subject. ¶ 60. On November 28, 2019, months before the start of the Class Period, the four government agencies which instituted the crackdown jointly issued a notice entitled "Definition of Apps' Illegal and Irregular Collection and Use of Personal Information." ¶ 63. This "Definition" explicitly identified six violations that could be committed by mobile application operators in the course of collecting and using consumers' personal information including: "*failure to obtain users' consent before collecting and using personal information*" and "*violating the principal of necessity and collecting personal information irrelevant to the services being provided*." ¶ 64.

Despite this repeated guidance from Chinese regulators, which consistently and uniformly reiterated the requirement of consent and limited the scope of information that could be collected only to what was necessary, Defendants chose to flout these regulations and collected personal information not necessary to the Company's lending business without customer consent, leading

6

to the removal of the 360 Jietiao app from app stores. Indeed, on May 10, 2021, Chinese regulators issued a public bulletin explaining that 360 DigiTech was found to have "collect[ed] personal information unrelated to the services provided, [and] collect[ed] and use[d] personal information without the user's consent." ¶ 91. Critically, the Company admitted that its illegal data collection practices directly led to the removal of the 360 Jietiao app from app stores. ¶ 74. On July 8, 2021, the last day of the Class Period, Sohu Business, a major Chinese business publication, reported that "the relevant person in charge [at 360 DigiTech]" *admitted* that the 360 Jietiao app was pulled from the market by regulators because of Defendants' "*illegal use of personal information*." *Id.*

### C. Despite Violating Chinese Data Privacy Regulations Throughout the Class Period, Defendants Assured the Market of Their Compliance

Though 360 DigiTech actively violated Chinese data privacy regulations throughout the Class Period, Defendants repeatedly and misleadingly touted the Company's purportedly superior compliance with these laws. For example, on April 30, 2020, the first day of the Class Period, the Company filed its 2019 annual report on Form 20-F (the "2019 Form 20-F") with the SEC. ¶ 76. In the 2019 Form 20-F, Defendants touted the Company's dedication to protecting customer data and assured investors that it always obtained adequate consent from customers before using their data, as required by multiple Chinese data privacy regulations, stating that "*[w]e are dedicated to privacy protection of our borrowers* . . . and *we adopt policies to make sure we* <u>*always*</u> *obtain users' consent for our use of data and enquire from other sources of their information*." *Id.* As the Class Period progressed, Defendants maintained this false story of 360 DigiTech's compliance with Chinese data privacy regulations. For example, on May 28, 2020, the Company held an earnings call to discuss its financial results for the first quarter 2020 (the "May 28, 2020 Earnings Call"). ¶ 77. On that call Defendant Haisheng Wu touted the Company's compliance with Chinese data privacy regulations, stating: "*[i]n terms of compliance, as a leading fintech platform in*

7

*China, we have **always** adhered to the highest standard in compliance*." *Id..*  Later, on June 3, 2020, 360 DigiTech issued a press release touting that it had registered its 360 Jietiao app with the National Internet Finance Association of China ("NIFA").  ¶ 80.  The press release quoted Defendant Haisheng Wu who stated that "*360 Finance places a high priority on providing robust data privacy protections and **will never collect data without users' consent***."  *Id.*  However, as the Company later conceded, Chinese regulators removed the 360 Jietiao app from app stores because of the Company's "*illegal use of personal information*," including because of the Company's collection of consumers' personal information without consent.  ¶ 74.

Defendants also convinced analysts of their purportedly superior compliance.  For example, on March 16, 2021, Citi issued an analyst report giving the Company a "Buy" rating, explaining that "[a]s we see regulatory overhang as largely removed and QFIN as the key beneficiary of the regulatory scrutiny against big tech . . . QFIN's valuation should continue to rerate and deserves a valuation premium over [its competitors] given its superior risk mgmt [sic] capability."  ¶¶ 83–84.

### D.  Government Regulators Warn 360 DigiTech of Its Non-Compliance

Then, on March 12, 2021, Chinese regulators issued the "Provisions on the Scope of Necessary Personal Information for Common Types of Mobile Internet Applications."  ¶ 87. Following this announcement came a flurry of regulatory activity as regulators began inspecting mobile app providers' compliance with Chinese data privacy laws.  *Id.*  On the last day of the Class Period, July 8, 2021, 21st Century Business Herald, a major Chinese business publication, revealed that on April 29, 2021, 360 DigiTech executives attended a meeting with Chinese financial regulators who warned them that 360 DigiTech was in violation of certain Chinese regulations governing the collection and use of borrowers' personal information and ordered by the regulators to bring the Company into compliance.  ¶ 88.  After the April 29 Meeting, the Chinese regulators

issued seven "rectification requirements," including the mandate that 360 DigiTech "standardize the collection and use of personal information[.]"  ¶ 89.

### E. The Truth Begins to Emerge as Chinese Regulators Reveal 360 DigiTech's Violations and Ultimately Remove the 360 Jietiao App from App Stores

On May 10, 2021, 360 DigiTech received yet another warning of its non-compliance with Chinese data privacy laws.  ¶ 90.  That day the Office of the Central Cyberspace Affairs Commission, a Chinese regulatory body responsible for managing internet-related issues, issued a public bulletin containing a list of internet finance apps, including 360 Jietiao, that illegally collected personal information (the "May 10 Bulletin").  ¶¶ 90–91.  Chinese authorities released the May 10 Bulletin after the Cyberspace Administration of China conducted inspections of popular online lending apps in response to complaints from the Chinese public, which alleged that 360 DigiTech infringed its users' privacy by illegally collecting their personal information.  ¶ 90. The Cyberspace Administration of China found three separate violations of Chinese data privacy laws by 360 DigiTech.  ¶ 91.  First, the Company was found to have "[v]iolate[d] the necessary principles and the requirements of *Regulations on the Scope of Necessary Personal Information for Common Mobile Internet Applications*"; second, the Company was found to have "collect[ed] personal information unrelated to the services provided"; and finally, the Company was found to have "collect[ed] and use[d] personal information without the user's consent."  *Id.*

The market reacted negatively to this news causing 360 DigiTech's stock price to drop $1.15 per share, or 4.98%, to close at $22.52 on May 10, 2021.  ¶ 92.  The May 10 Bulletin ordered that the Company "complete [] rectification within 15 working days from the date of issuance of th[e] [May 10 Bulletin,]" allowing the Company to avoid any sanctions if it immediately suspended its illegal data collection practices.  ¶ 93.

However, instead of warning investors of the likely possibility that the Company would

9

not be able to rectify the 360 Jietiao app in time, Defendants chose to double down and continue to mislead the market with respect to the Company's compliance with Chinese data privacy regulations.  On May 27, 2021, 360 DigiTech held an earnings call discussing the Company's first quarter 2021 financial results (the "May 27, 2021 Earnings Call").  ¶ 95.  During that call Defendant Haisheng Wu reassured investors "***[w]e have consistently held our operations to the highest of compliance standards.  Therefore, we are very confident we can meet any regulatory requirements applied to this industry***" (¶ 96), giving investors the false impression that the Company had already or would imminently rectify the violations flagged in the May 10 Bulletin.

However, just over a month later, on July 8, 2021, Chinese regulators removed the 360 Jietiao app from most major app stores within China, including the Android app store.  ¶ 98.  As a result, potential borrowers were no longer able to download the app and could not apply for new loans, meaning that the Company could no longer generate income from new customers.  *Id.*  That same day, Sohu Business, another major Chinese business publication, further reported that the 360 Jietiao app had been removed from "mainstream application platforms such as Tencent App Store, Huawei App Store, Xiaomi App Store and 360 Mobile Assistant."  ¶ 100.  According to the report, "the relevant person in charge [at 360 DigiTech]" admitted that "***the removal was related to the illegal use of personal information***."  *Id.*  Indeed, though 360 DigiTech had dozens of competitors, the 360 Jietiao app was the only app removed from app stores.  *Id.*

This news stunned the market causing 360 DigiTech's stock price to drop precipitously.  ¶ 102.  By the time the market closed on July 8, 2021, the Company's stock dropped $7.12 per share, or ***21.48%,*** to close at $26.02.   *Id*.  On July 9, 2021, Seeking Alpha released a post confirming that the 360 Jietiao app had been removed from app stores because 360 DigiTech had been improperly "over-collecting and using personal information."  ¶ 103.  The post quoted a

10

spokesperson from 360 DigiTech who explained that "[c]urrently, we have submitted a new rectification plan and stepped up the whole process." *Id.*

### III.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE ACTIONABLE MATERIAL MISSTATEMENTS AND OMISSIONS

Defendants' arguments that the Complaint fails to adequately allege a material misrepresentation are predicated on improper and incorrect ***factual*** assertions that the Court must reject at the pleading stage. MTD at 13–22. Indeed, "[i]n addressing the sufficiency of a complaint [courts must] accept as true all factual allegations[.]" *KBC*, 2022 WL 480213, at *1. Courts must also construe the "complaint in the light most favorable to the [p]laintiffs, and [] draw reasonable inferences in the [p]laintiffs' favor." *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017).

The two primary factual pillars of Defendants' motion are: (i) the Company was found to have violated ***only*** what Defendants characterize as the "May 1 Provisions" and (ii) Defendants did not, and therefore could not, know what the Chinese data privacy regulations required of 360 DigiTech. However, not only are these assertions improper and illogical on their face, but they are directly contradicted by the facts in the Complaint, which must control on a motion to dismiss. Indeed, at no point in their brief do Defendants refute that the Company illegally collected data; rather, they grossly mischaracterize the relevant regulations and the Company's violations in an attempt to move the goal posts and obfuscate Plaintiff's well-pled allegations.

### A. Throughout the Class Period, 360 DigiTech Violated Chinese Data Privacy Laws in Existence Since as Early as 2011

Defendants spend much of their brief arguing that their alleged misstatements could not have been false because they claim the Company was not in violation of Chinese data privacy laws

11

throughout the Class Period.  MTD at 16–20.[4]  Specifically, Defendants claim that the May 10 Bulletin found that 360 DigiTech violated only one regulation, the "Provisions on the scope of Necessary Personal Information for Common Types of Mobile Internet Applications," which Defendants refer to as the "May 1 Provisions."  MTD at 10, 14, 15, 18.[5]  However, Defendants conveniently ignore that the May 10 Bulletin identified *at least three distinct violations of Chinese data privacy regulations by the 360 Jietiao app*, all of which rendered Defendants' Class Period statements touting the Company's regulatory compliance false and misleading.

Specifically, along with violating the May 1 Provisions, Chinese regulators *also* found that the Company "collect[ed] personal information unrelated to the services provided," and "collect[ed] and use[d] personal information without the user's consent" through the 360 Jietiao app.  ¶ 91.  Both collecting unnecessary information and failing to obtain consumers' consent *violated numerous Chinese data privacy regulations in effect since as early as 2011—nine years before the Class Period*.

For example, Article 11 of the "Provisions on Standardizing the Internet Information Service Market," promulgated in 2011, *prohibits internet service providers from collecting personally identifiable information or providing such information to third parties without the*

---

[4] Defendants' recharacterization of the April 29 Meeting is nonsensical.  Defendants appear to argue that their statements were not false because regulators purportedly did not warn the Company of its non-compliance at the meeting and merely asked that companies "standardize the collection and use of personal information" because of a "policy preference."  MTD at 17–18.  However, contrary to Defendants' self-serving narrative, the Complaint alleges with specificity that the April 29 Meeting served as a warning to Defendants about their violation of applicable data privacy laws.  ¶¶ 88–89.  Indeed, Defendants ignore the fact that a demand for rectification was specifically identified by Chinese regulators as a sanction for violating the Cyber Security Law.  ¶ 89; ¶ 62 ("punishments [for violating the Cyber Security Law] included 'ordering relevant [a]pp operators to make rectification within the time limit'").

[5] Moreover, while Defendants emphasize that the "May 1 Provisions" were new laws, in actuality they provided little more than additional guidance for preexisting regulations governing data collection.  Moreover, the "May 1 Provisions" do not mention the requirement of user consent, one of 360 DigiTech's violations identified at the end of the Class Period.  Accordingly, Defendants' argument that the "May 1 Provisions" were the only regulations that 360 DigiTech violated is belied by the May 10 Bulletin, which identified as one of the Company's violations the collection of users' personal information without consent.

12

*users' consent*.  ¶ 58.  Similarly, according to Article 41 of the Cyber Security Law enacted in 2016, network operators *must comply with the principals of legality, rationality, and necessity in collecting and using personal information, and must obtain the information owner's consent to use or collect such information*.  ¶ 58.  Finally, the "Definition of Apps' Illegal and Irregular Collection and Use of Personal Information" enacted in November 2019, months before the Class Period, specifically identified six violations including: *failure to obtain users' consent before collecting and using personal information* and *violating the principle of necessity and collecting personal information irrelevant to the services being provided*.  ¶¶ 63–64.  Accordingly, contrary to Defendants' claims, the alleged illegal data collection practices identified in the Complaint violated no less than three regulations, all of which were in place prior to and during the Class Period.

With respect to the July 8, 2021 removal of the 360 Jietiao app, Defendants' claim that "Plaintiff fails to plead any facts to show that the removal had anything to do with violations of Chinese data privacy laws."  MTD at 19–20.  But this argument is flatly contradicted by numerous allegations in the Complaint.  For instance, the Complaint alleges that, on July 8, 2021, the 21st Century Business Herald attributed the removal "to the fact that financial regulatory authorities . . . asked for rectification on April 29th of [2021]."  ¶ 129.  Likewise, the Complaint explains that the same day, Sohu Business reported that "the relevant person in charge [at 360 DigiTech]" admitted that the removal was "related to the illegal use of personal information."  ¶ 130.[6]

---

[6] Moreover, Defendants' attempts to discredit the 360 DigiTech employee quoted in the Sohu article (MTD at 19–20) misses the mark.  Defendants attempt to graft a case addressing the pleading requirements for *confidential witnesses* onto a quote contained in a news article that was specifically attributed to the "relevant person in charge [at 360 DigiTech]."  MTD at 20 (citing *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000)); *see Novak*, 216 F.3d at 314 (discussing pleading requirements "where plaintiffs rely on confidential personal sources").  However, it is non-controversial that "[w]hen drafting a complaint, an attorney may rely in part on other sources, such as a newspaper article[.]"  *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008).

Finally, the Complaint also alleges that a Seeking Alpha article corroborated that the 360 Jietiao app was removed from app stores because 360 DigiTech had been improperly "over-collecting and using personal information" and quoted a Company spokesperson who stated "[c]urrently, we have submitted a new rectification plan and stepped up the whole process." ¶ 103. Defendants' attempt to explain away the removal of the 360 Jietiao app is nothing more than a red herring intended to distract from the Company's own admission of regulatory violations to the Chinese press.

Defendants also declaim against well-pled allegations of falsity because the Company received the "highest level rating in data privacy from [the National Computer Virus Emergency Response Center ("NCVERC").]" MTD at 17. However, Defendants offer no explanation how a certification from an agency focused on detecting computer viruses establishes that the Company did not engage in the illegal data collection practices alleged in the Complaint. Given the tenuous (if existing) connection between the NCVERC ratings and the Company's illegal data collection practices, the Company's NCVERC ratings should have no bearing on the Court's analysis of the falsity of Defendants' misstatements.

Accordingly, none of Defendants' counter-factual arguments negate the particularized and well-pled allegations in the Complaint establishing that Defendants violated existing Chinese data privacy regulations throughout the Class Period, which thereby rendered their statements to the contrary false and misleading.

### B. The Company's Purported Risk Warnings Were Insufficient to Counterbalance the False Nature of Their Repeated Positive Statements Regarding Data Privacy

Defendants argue that their statements were not false because of purported warnings included in the Company's 2019 and 2020 annual reports filed with the SEC on Forms 20-F. MTD at 14–15. However, this argument fails for two independent reasons. *First*, in order to overcome

14

the false nature of Defendants' statements, their "warnings" "must be conveyed to the public '*with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created* by' the alleged misstatements." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 562 (S.D.N.Y. 2017) (emphasis added) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)).  Here, the opposite is true—Defendants' repeated *guarantees that the Company was operating in compliance with all Chinese data privacy laws* overrode any purported boilerplate warning that were buried in the Company's voluminous SEC filings.  Indeed, Defendants' tentative warnings that the Company *may be* found to be in violation of Chinese data privacy regulations could not possibly have counterbalanced the false information created by Defendants' repeated statements that "*we always obtain users' consent for our use of data*" (¶ 106) and "*[we] will never collect data without users' consent*" (¶ 113).

*Second*, Defendants' superficial warnings about possible future risks failed to adequately warn investors about the *current fact* that Defendants knew 360 DigiTech was in violation of numerous data privacy regulations *at that time*.  *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, [defendant] was akin to 'someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'").  Defendants' tentative warnings about what "may" happen did not adequately warn investors about the truth of what was occurring inside the Company at that time.

## C.  The Alleged Misstatements Are Not Inactionable Puffery

In a last-ditch effort to overcome the Complaint's well-pled allegations, Defendants argue that every misstatement alleged in the Complaint amounted to mere puffery.  MTD at 20–22. However, the Second Circuit has explained that statements may be considered puffery only if they "are too general to cause a reasonable investor to rely upon them." *In re Vivendi, S.A. Sec. Litig.*,

15

838 F.3d 223, 245 (2d Cir. 2016).  Indeed, courts shall not consider statements puffery if "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015).  Additionally, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

When viewed in context, none of the alleged misstatements constitute inactionable puffery. For example, Defendants' statements that they "***always obtain users' consent for our use of data***" (¶ 106) and "***will never collect data without users' consent***" (¶ 113) are worded as "guarantees" that a reasonable investor would understand to mean that the Company was not and would not violate any data privacy regulation that required consent.  Similarly, Defendants' statements that "***we have always adhered to the highest standard in compliance***" (¶ 108), "***[w]e have consistently held our operations to the highest of compliance standards***" (¶ 124),[7] and "***360 Finance has placed the upmost [sic] importance on protecting user information***" (¶ 110), are not puffery, and would no doubt be considered material to investors because the Company's compliance with Chinese data privacy laws was critical to its continued operations.  Indeed, as set forth in the Complaint, analysts specifically attributed a "valuation premium" to 360 DigiTech over its competitors because they were convinced by Defendants' statements that any "regulatory overhang [w]as largely removed."  ¶¶ 83–84.

---

[7] In a single sentence devoid of explanation, Defendants claim the second half of Defendant Haisheng Wu's statement, "we are very confident we can meet any regulatory requirements applied to this industry," is an inactionable opinion. MTD at 22 (citing ¶ 124).  This statement is not an opinion because of the context in which it was made.  Tellingly, Defendants attempt to improperly split this statement apart because as described above, the first half would lead a reasonable investor to believe that the Company was in compliance with all Chinese data privacy regulations. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) (finding that context is an important consideration when determining whether a statement is an opinion).

Finally, that Defendants chose to repeat their guarantees that the Company was complying with all Chinese data privacy laws at multiple points in the Class Period indicates their materiality. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) ("[W]hen the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors."). Accordingly, the alleged misstatements are not puffery.

### D. Because 360 DigiTech Chose to Speak on Its Regulatory Compliance and Data Collection Practices, It Had a Duty to Speak the Full Truth

Defendants argue that they were under no duty to disclose the Company's violations of Chinese data privacy regulations because there is no duty to disclose uncharged criminal conduct. *See* MTD at 15–16. However, this argument misconstrues Plaintiff's allegations. Plaintiff does not claim that 360 DigiTech had a duty to self-report its violations of Chinese data privacy laws in a vacuum; rather, Defendants had a duty to disclose the ***actual*** source of their business success, because they ***chose to tout the Company's compliance to the market***. Indeed, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 490 (S.D.N.Y. 2011) (emphasis added) ("[A] duty to speak the full truth arises when a defendant undertakes a duty to say ***anything***.").

For instance, Defendants chose to tell the market that "***we adopt policies to make sure we always obtain users' consent for our use of data and enquire from other sources of their information***" (¶ 106); "***we have always adhered to the highest standard in compliance***" (¶ 108); and "***[we] will never collect data without users' consent***" (¶ 113). By making such strident claims, Defendants were required to disclose all material information concerning the Company's

17

compliance with data privacy regulations, including whether they were over-collecting customer data without consent.   However, Defendants instead chose to omit that the Company's data collection practices at the time violated Chinese data privacy laws.   As courts have explained, this is a paradigmatic example of a required disclosure because "[m]aterial facts include those that affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities."  *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 119 (D. Conn. 2021) (quoting *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001)).   Accordingly, Defendants were under a duty to disclose the Company's illegal data collection practices and failed to do so.

## IV.   THE COMPLAINT ADEQUATELY ALLEGES A STRONG INFERENCE OF SCIENTER

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A). "Plaintiffs can plead scienter by . . . alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).  When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  In other words, "the allegations going to scienter are to be evaluated collectively."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 572 (S.D.N.Y. 2012).  This holistic analysis requires courts to consider whether ***all the allegations contained in the Complaint*** taken together support an inference that Defendants knowingly or recklessly made the false statements at issue.[8]  Throughout

---

[8] Moreover, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"; rather, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314, 324.  That is, "a tie on scienter goes to the plaintiff."  *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at \*6 (S.D.N.Y. June 21, 2021); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at \*10 (S.D.N.Y. June 16, 2020) (same).

their brief, Defendants attempt to pick off the Complaint's scienter allegations, one-by-one. Leaving aside the question of whether Defendants carry the day on the merits via this method, such analysis flies in the face of many years of post-*Tellabs* jurisprudence.   Defendants' suggestions notwithstanding, the Court must reject any such invitation.

### A. Data Privacy Regulations and the 360 Jietiao App Were Critical to 360 DigiTech's Core Operations—Supporting a Strong Inference of Scienter

Defendants' arguments against Plaintiff's use of the core operations doctrine to support a strong inference of scienter is misplaced.  MTD at 24 n.10.  As part of the Court's holistic analysis, the core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business."  *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at \*26 (S.D.N.Y. Dec. 2, 2013); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (emphasis added) ("allegations regarding core operations may factor into a ***court's holistic assessment*** of scienter allegations").  Matters that are "critical to the long[-]term viability" of a company and affect a "significant source of income" are core operations and alone can raise a strong inference of scienter.  *Hi-Crush Partners*, 2013 WL 6233561, at \*26.  Furthermore, executives "ha[ve] a duty to familiarize [themselves] with the facts relevant to the core operations of the company" and the reporting of those operations.  *In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021).

Tellingly, Defendants do not—because they cannot—argue that data privacy regulations and the 360 Jietiao app were not critical to the Company's core operations.  In fact, Defendants' own Motion refers to the 360 Jietiao app as 360 DigiTech's "core product."  MTD at 1.  Indeed, Defendant Haisheng Wu himself stated that "maintain[ing] the highest standard of compliance in line with the latest regulations" was "***critical*** for healthy and sustainable development of our

19

business." ¶ 155.  The Company similarly stated that "[e]nhancing the recognition and reputation of our brand is *critical* to our business and competitiveness," and "[f]actors that are *vital* to this objective include" the Company's ability to "effectively protect *personal information and privacy of borrowers*."  ¶ 155; *see also* ¶¶ 156–157 (Defendants acknowledging the material impact that not complying with privacy laws would have on its business and data).

Unable to dispute these facts, Defendants' only argument against the Court's application of the core operations doctrine to its overall scienter analysis is a boilerplate reference to "considerable doubt" whether it survived enactment of the PSLRA twenty-seven years ago.  MTD at 24 n.10.  But of course that contention is belied by numerous cases published since then holding that the core operations doctrine is part of the holistic analysis of scienter.[9]  Indeed, according to this Circuit, the PSLRA did not change the pleading standard for scienter other than adding the words "with particularity."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13, 14 n.3 (2d Cir. 2011) (recognizing core operations as a viable method of supporting scienter); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("Congress 'did not change the basic pleading standard for scienter in this [C]ircuit."); *Novak*, 216 F.3d at 311 (same).[10]

Defendants further argue that the Chinese government's increased level of scrutiny on Chinese Fintech companies cannot support scienter since that information was "generally known or available to the public."  MTD at 24 n.10.  However, Defendants' argument completely misses the point.  Plaintiff is not alleging that Defendants concealed this heightened regulatory scrutiny.

[9] *See, e.g.*, *Cheng v. Canada Goose Holdings Inc.*, 2021 WL 3077469, at *10 (S.D.N.Y. July 19, 2021) ("I will apply the modified approach followed by district courts in this Circuit, and consider the 'core operations' allegations to constitute a supplementary, but not an independent, means to plead scienter."); *Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (same); *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) (same).

[10] *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) does not require the Court to reject the Complaint's core operations allegations because the Second Circuit there only found that the plaintiff's core operations allegation was a "naked assertion" since—unlike here—the "[plaintiff] offer[ed] no arguments other than merely stating that the MicroCool gown was a 'key product.'"

20

Instead, the Complaint alleges that heightened regulatory scrutiny and its "generally known" nature support the inference that in the face of Chinese regulators' increasing focus on companies' collection of customer data, it is implausible that Defendants did not know, or at the very least were reckless in not knowing, that 360 DigiTech was over-collecting user data without their consent.[11]

Therefore, given the importance of compliance with data privacy regulations as well as heightened regulatory scrutiny, knowledge that 360 DigiTech violated data privacy regulations can be imputed to the Individual Defendants.

## B. Defendants' Statements Themselves Support a Strong Inference of Scienter

Defendants also argue that their own statements themselves cannot support a strong inference of scienter. MTD at 24 n.10. However, Defendants offer no arguments to support such a contention, and they again miss the relevance of these allegations. It is well-settled that a strong inference of scienter can be established when Defendants publicly discuss a specific issue in great detail. *Alexion*, 556 F. Supp. 3d at 133–34 (allegations that defendants "made statements during earnings calls and in SEC filings about the" subject matter constituting the fraud provided "'strong circumstantial evidence that [these defendants] were receiving some form of specific information' about the subject"); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,

---

[11] Defendants' reliance on *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (MTD at 24 n.10) is misplaced because *Glaser* simply stated in dicta the uncontroverted proposition that plaintiffs cannot establish scienter by alleging that defendants concealed facts already publicly known. *C.f. In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595–96 (S.D.N.Y. 2010) (no scienter where plaintiffs alleged defendants failed to alter loss assumptions on investments despite being aware of declining housing market because "[p]laintiffs were just as aware of the housing market crisis as they allege [d]efendants were, but they did not act on that information to sell their stock as the price declined"). In contrast, here, while it was publicly known that the Chinese government increased its scrutiny on companies such as 360 DigiTech, Plaintiff had no way of knowing that 360 DigiTech was not compliant with regulations.

21

875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (finding specific pronouncements provided "strong circumstantial evidence" speakers were "receiving some form of specific information" about matters at hand); *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (finding it "absurd" to consider that a senior vice president did not have knowledge of information contradicting her statements when she took an active role in communicating with the press about a particular issue), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Throughout the Class Period, Defendants repeatedly spoke about 360 DigiTech's customer data collection process and compliance with relevant data privacy regulations. Specifically, Defendant Haisheng Wu touted to the public that "***360 Finance places a high priority on providing robust data privacy protections and will never collect data without users' consent***." ¶ 113; ¶ 117 (similar). Defendants further touted that "[w]e are ***dedicated to privacy protection of our borrowers during our risk management process, and we adopt policies to make sure we always obtain users' consent for our use of data and enquire from other sources of their information.***" ¶¶ 106, 117.

Those specific reassurances detailing the Company's data privacy policies provide strong circumstantial evidence that Defendants were receiving specific information about those matters and give rise to an inference of scienter. Alternatively, if the Individual Defendants were not knowledgeable about such matters before they spoke about them or were unaware of the issues at hand at the time they made the various challenged statements, then their representations were reckless. *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (noting when defendant speaks but does not have "actual knowledge" about the subject, "it would be at

22

least actionably reckless to reassure the public about these matters at all").[12]

### C. The Strong Inferences of Scienter Alleged Are At Least As Compelling as Any Opposing Inferences of Nonfraudulent Intent

Defendants also argue that because 360 DigiTech received a high data privacy rating, the only plausible and compelling inference is that new regulatory developments required the Company to make additional changes to its app. MTD at 24. However, Defendants' single (supposedly) innocent inference is no more compelling than the multiple scienter inferences alleged in the Complaint. In fact, Defendants' argument does not even create an inference of nonfraudulent intent. It simply points out that the Company had to "keep up with ever more stringent data privacy regulations." *Id.* This is true; that is exactly what the Company had to do. But Defendants failed to do this throughout the Class Period and concealed this failure from investors.[13]

### V.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiff's burden of pleading loss causation "is not a heavy one." *Loreley*, 797 F.3d at 187 (citing *Dura*, 544 U.S. at 347). "The complaint must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.* At the motion to dismiss stage, plaintiffs "need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are

---

[12] *Smith v. Foster*, 168 F. Supp. 3d 654, 660 (S.D.N.Y. 2016) does not compel a contrary conclusion. There plaintiff tried to establish defendant's fraudulent intent merely because it recommended investing in light of defendant's misrepresentations. *Id.* But, unlike here, the plaintiff there did not allege any other reason why the defendant knew or was reckless in not knowing its statements were false or misleading. *Id.*

[13] Additionally, because Plaintiff need not allege actual knowledge, Defendants' argument that the Complaint's scienter allegations fail by not alleging that any Defendants **knew** of any compliance issues (MTD at 23–24) should be rejected. Furthermore, Defendants argue that the Complaint's scienter allegations fail because Defendants supposedly did not have a duty to disclose. *Id.* However, in addition to improperly conflating falsity and scienter, such argument should be rejected for the same reasons already explained in Section III.D, *supra*.

issues of proof reserved for the merits stage of the case." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 2021 WL 4443562, at \*4 (S.D.N.Y. Sept. 28, 2021) (citing *Loreley*, 797 F.3d at 187, 189). Moreover, in the Second Circuit, loss causation allegations are subject to less stringent Rule 8 pleading requirements. *In re Synchrony Fin. Sec. Litig.*, 2022 WL 427499, at \*3 (D. Conn. Feb. 11, 2022); *id.* (quoting *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011)) ("'The [] majority of courts' in the Second Circuit, however, 'have required that loss causation meet only the requirements of Rule 8.'"). Finally, plaintiffs may sufficiently plead loss causation "*either* by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (internal quotation marks omitted).

Here Plaintiff has sufficiently alleged that Defendants' statements assuring investors of the Company's compliance with Chinese data privacy regulations caused investor losses when it was revealed on May 10, 2021 that the Company was found to have violated Chinese data privacy regulations, and on July 8, 2021 when the 360 Jietiao app was removed from app stores as a result of Defendants' illegal data collection practice. ¶¶ 139–140, 144–150. It strains credulity to claim those two events were unrelated to Defendants' false statements touting the Company's compliance with the same regulations that were cited in the May 10, 2021 disclosure and caused the Chinese government to remove the app on July 8, 2021.

Defendants contend that the drop in 360 DigiTech's ADSs was the result of a "widely reported crackdown on multiple U.S.-listed Chinese technology companies in July 2021." MTD

24

at 25.[14]  As discussed in Plaintiff's accompanying motion to strike, these assertions are an improper attempt to argue the facts at the pleading stage, which must be rejected before the parties have had an opportunity for discovery.  Further, the Second Circuit has explicitly rejected this kind of self-serving *factual* argument as a basis for contesting loss causation at the pleading stage.  *Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 404–05 (2d Cir. 2015) ("if the loss was caused by an intervening event . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").  Accordingly, Plaintiff has adequately pled loss causation.

## CONCLUSION

For the reasons set forth above, Defendants' Motion should be denied in its entirety.

DATED:  Friday, April 29, 2022          Respectfully submitted,

/s/ James W. Johnson
**LABATON SUCHAROW LLP**
James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
Robert S. Rowley
140 Broadway
New York, NY 10005
T: 212-907-0700
F: 212-818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
jchristie@labaton.com
rrowley@labaton.com

*Counsel for Lead Plaintiff Gad Sorek and the Proposed Class*

---

[14] Defendants also argue that the enactment of the "May 1 Provisions" was a market-wide event, which caused Plaintiff's loss.  *Id.*  As explained above, because 360 DigiTech was violating multiple other Chinese data privacy regulations, the May 1 Provisions are irrelevant.  Moreover, Plaintiff does not plead that the enactment of the May 1 Provisions, which were first announced in March 2021 (¶ 18), caused any drop in 360 DigiTech's ADS price, nor do Defendants suggest otherwise.