M7PQdigO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE 360 DIGITECH SECURITIES
LITIGATION

                              21 Civ. 6013 (AKH)
------------------------------x

                              New York, N.Y.

                              July 25, 2022
                              2:30 p.m.

Before:

          HON. ALVIN K. HELLERSTEIN

                              District Judge

                    APPEARANCES

LABATON SUCHAROW
     Attorneys for Plaintiffs
JAMES CHRISTIE
ROBERT ROWLEY


SKADDEN ARPS SLATE MEAGHER & FLOM
     Attorneys for Defendant 360 DigiTech
ROBERT FUMERTON
BEATRIZ PATERNO
MICHAEL GRIFFIN
MAISIE WILSON

M7PQdigO

(In open court; case called)

DEPUTY CLERK:  Counsel, please state your appearances for the record.

THE COURT:  I'll do that.

James Christie of Labaton Sucharow.

MR. CHRISTIE:  Yes, your Honor, that's me.

THE COURT:  And who is your colleague?

MR. CHRISTIE:  With me here is Robert Rowley, also from Labaton Sucharow.

THE COURT:  How do you spell your last name, Mr. Rowley?

MR. ROWLEY:  R-O-W-L-E-Y.

THE COURT:  And we have three represents of Skadden, Arps representing 360 DitiTech, Robert Fumerton.

MR. FUMERTON:  That's correct, your Honor.

THE COURT:  Beatriz Paterno.

MS. PATERNO:  Yes, your Honor.

THE COURT:  And Michael Griffin.

MR. GRIFFIN:  Good afternoon, your Honor.

MR. FUMERTON:  Your Honor, we are also joined by Maisie Wilson from Skadden as well.

THE COURT:  Daisy?

MR. FUMERTON:  Maisie Wilson.

THE COURT:  Maisie Wilson.

MR. FUMERTON:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

M7PQdigO

THE COURT:  I think also if the speakers stay seated and use the microphone, that would be better also.

I'd like to deal with a motion to strike first.  It's defendant's motion.  Is that right, Mr. Fumerton?

MR. FUMERTON:  It's not, your Honor.  That's plaintiff's motion.

THE COURT: Sit.  Sit.  Sit.

MR. FUMERTON:  Sorry.

THE COURT:  Whose motion is it?

MR. FUMERTON:  It's plaintiff's motion, your Honor.

THE COURT:  Plaintiff's motion.

MR. FUMERTON:  And, your Honor, just briefly, while we're happy to argue the motion to strike, and my colleague is prepared to address it, your Honor need not resolve the motion to strike to rule on the issues of misstatement and scienter.

THE COURT:  I'm aware of that.

MR. FUMERTON:  Thank you, your Honor.

MR. CHRISTIE:  Would you like me to proceed, your Honor?

THE COURT:  Yes.  I just want to tell you first this is a Rule 12 motion.  So unless an exhibit or a statement of fact in an affidavit is, in effect, referred to by the complaint and to be incorporated into the complaint, I won't consider it.

MR. CHRISTIE:  Understood, your Honor.

M7PQdigO

THE COURT:  I'll be granting a motion to strike it. With that knowledge, how many of these documents do you want stricken?  All of them?

MR. CHRISTIE:  No, your Honor, it's not all of them. There are a number of exhibits that we do want stricken because, as your Honor mentioned, they weren't mentioned in the amended complaint nor are they integral to it.

Those ones that we're challenging are Exhibits E, J, K, L, Q, R, S, T, U, and then also, your Honor, it's Exhibit I, which is an earnings call transcript that wasn't cited in the amended complaint.

THE COURT:  Which ECF number is it?

MR. CHRISTIE:  I'm sorry, your Honor?

THE COURT:  Which ECF number do I look at?

MR. CHRISTIE:  One moment, your Honor.

THE COURT:  It would be defendant's affidavit.

MR. CHRISTIE:  The ECF number for our motion to strike, your Honor --

THE COURT:  I don't need that.  I need the declaration to which you make an objection.

MR. CHRISTIE:  It's ECF number 46, your Honor.

THE COURT:  That doesn't have any -- there are no exhibits to that.

MS. PATERNO:  Your Honor, I believe it's ECF 47.

MR. CHRISTIE:  47, your Honor.  My apologies.

M7PQdigO

THE COURT:  It's your declaration, Mr. Fumerton.

MR. FUMERTON:  That's correct, your Honor.

THE COURT:  So is it your exhibits that should be stricken?

MR. FUMERTON:  Yes, your Honor.  Plaintiff has moved to strike certain of the exhibits that were attached to my declaration, which is ECF 47.

THE COURT:  5, 9 through 12 and 16 to 23, right, Ms. Paterno?

MS. PATERNO:  I'm sorry, your Honor.  Are you referring to the exhibits?

THE COURT:  5, 9 through 12 and 16 through 23.

MR. FUMERTON:  I do believe that's right.

THE COURT:  It's right based on the papers.

So, Mr. Fumerton, defend them.

MR. FUMERTON:  Your Honor, my colleague Ms. Paterno is prepared to address this, if that's acceptable.

THE COURT:  Yes, it's acceptable, but I'm confused. It's your motion to strike plaintiff's exhibits, right?

MR. FUMERTON:  No, your Honor.  It's plaintiff's motion to strike defendant's exhibits.

THE COURT:  Okay, I got it.

MR. FUMERTON:  So we submitted this in connection with defendant's motion to dismiss.

THE COURT:  I'm confused by the letters you gave me.

M7PQdigO

MR. CHRISTIE:  Those are the letters of exhibits that defendants submitted with their motion to dismiss.  Those are with letters, not numbers.

THE COURT:  My apologies.  Okay.

So defend them, number 5 or E.

MS. PATERNO:  Would you like me to address this?

THE COURT:  You made the motion.

MR. CHRISTIE:  No, we made the motion, your Honor, plaintiffs.

THE COURT:  I'm sorry, I'll get it yet.

Okay, Ms. Paterno.

MS. PATERNO:  Apologies, your Honor.  Would you like me to proceed with the --

THE COURT:  Yes, tell me about 5.

MS. PATERNO:  So, with respect to Exhibit E, which is a *New York Times* article --

THE COURT:  It's a *New York Times* article.

MS. PATERNO:  Yes.

THE COURT:  So it's presumptively irrelevant.

Why does it fail, Ms. Paterno.

MS. PATERNO:  I think there's no disagreement here that newspaper articles are subject to judicial notice for the limited purpose of noticing what was known to the public at the time, and that's a fact that plaintiffs don't dispute in their briefings either.  And that is the only purpose for which we've

M7PQdigO

submitted this exhibit and Exhibits J through L, which are also newspaper articles which refer to the April 29 meeting.

THE COURT:  Motion to strike is granted.

MS. PATERNO:  I'm sorry, your Honor?

THE COURT:  Motion to strike is granted.  It's outside the pleadings.  And this is a motion under Rule 12.

Next, 9.

MS. PATERNO:  9, I believe, is Exhibit J.  And I apologize, I think the exhibits were submitted with letter numbers.

THE COURT:  It's Exhibit I, the transcript.

MS. PATERNO:  With respect to Exhibit I, we believe this is integral to the complaint.  Plaintiffs do actually rely on the terms and effect of this document because their entire days is essentially based off of what the company admitted with respect to why the app in question here was removed on July 8, and this document relates to that directly.  It is the company's own admission with respect to why the --

THE COURT:  What paragraph of the complaint should I look at?

MS. PATERNO:  Complaint, if you look to paragraph 107, again, plaintiffs are basing their misrepresentation claim on what the company admitted.  So if you look to the bottom of page 33, the plaintiffs state:  "Indeed, unbeknownst to investors, as the company admitted at the end of the class

M7PQdigO

period, the 360 DitiTech app was removed from app stores by Chinese regulators due to the company's illegal use of personal information."

THE COURT:  You want to show that this is a false -- they you can deny this?

MS. PATERNO:  This is one of the company's three admissions regarding the reasons for the removal.  And to the extent the plaintiffs claim that they did not rely on this document in framing the complaint, we believe that's disingenuous because they don't deny here that they had actual notice of the exhibit or that they possessed it.  And they're relying on what the company admitted with respect to the temporary app removal to show that there was some sort of illegal data privacy practices ongoing at the time.

THE COURT:  The motion is granted.  That's a denial, and this is a Rule 12 motion.

Next.

MS. PATERNO:  So next, your Honor, I believe are Exhibits J through L, which are all again newspaper articles that we think the Court may take judicial notice of because --

THE COURT:  I'll do the same thing.  I'm not considering these outside the pleadings.  They're all stricken.

MS. PATERNO:  Yes, sir.

THE COURT:  Is there anything I should really look at that's different, of a different character?

MS. PATERNO:  Well, your Honor, with respect to Exhibits Q through U, we'd just like to clarify that we are only offering these documents to establish the fact, only the fact of a market-wide event that coincided with the July 8, 2021 app removal.

THE COURT:  I'm not making findings of fact.  I'm looking to see if the pleadings are legally sufficient.  The motion to strike is granted.

Next, thing you want to take up, Mr. Fumerton, is what about the individual defendants?

MR. FUMERTON:  Your Honor, we do not represent the individual defendants and none of them have been served in this case.  We only represent the company.  We've moved to dismiss the complaint in its entirety on behalf of the company.

THE COURT:  Are you Mr. Fumerton?

MR. FUMERTON:  Yes.

THE COURT:  Mr. Christie, sorry.  Tell me about the individual defendants.

MR. CHRISTIE:  Yes, your Honor.  So, as you may know, we did inform the Court that we've now begun the process of serving the individual defendants through the Hague Convention. As your Honor may know, that's a fairly lengthy process, though we have begun the process, and we've been informed that we would expect that that would take about a year to two years in order to get information back from the Hague service in China.

THE COURT:  I can't keep the case waiting that long if it's indeed a legally sufficient case.

But you don't mention Asim Khan or Ricardo Schammas or any other defendant other than Haisheng Wu.  Why should they be in the case?

MR. CHRISTIE:  Yes, your Honor.  So with respect to Mr. Haisheng Wu, he had made statements during the class period, and --

THE COURT:  I said with the exception of Haisheng Wu.  What about the others?  You don't mention them.

MR. CHRISTIE:  Your Honor, we would be moving against them under a theory of control personal liability under Rule 20(a) and that would be that they controlled both the day-to-day operations of the company but also some of the statements that were made because of their roles and positions at the company.

THE COURT:  These are all conclusory statements in paragraph 171, and the fact that they are senior executive officers doesn't mean that they had knowledge whether or not these statements that are alleged to be false misrepresentations were true or false, nor does it tell me that they have control of the company.  They're not here, but I can tell you, you would be wasting a lot of money going after people who you have no basis to sue.

MR. CHRISTIE:  I don't disagree with you, your Honor.

M7PQdigO

THE COURT:  That's with the exception of Haisheng Wu, who also hasn't been served yet, correct?

MR. CHRISTIE:  Correct, your Honor.  He's under the same process as the other individual defendants.

THE COURT:  Yeah, is there a provision in Rule 9 to hasten that service?

MR. CHRISTIE:  I believe, your Honor, yes, we could ask for alternative service either through email or through some other publication, either through the *Wall Street Journal* or *New York Times* or in a publication in China that can happen. However, traditionally, the first step is to go through the Hague Service Convention, but, your Honor, that's in your discretion as to whether you think service through alternative process would work.

THE COURT:  The case advances.  You can make an appropriate motion to accomplish that kind of service.

MR. CHRISTIE:  Thank you, your Honor.

THE COURT:  Now we'll go to the motion to dismiss.

Mr. Fumerton, are you going to be speaking on that?

MR. FUMERTON:  Yes.  Thank you, your Honor.  We prepared a short demonstrative that we've shared with the other side.  May I approach to give your Honor a copy?

THE COURT:  If you feel that I should be helped, okay.

MR. FUMERTON:  Thank you, your Honor.

THE COURT:  Give me a moment to read this.  What does

page 1 tell me?

MR. FUMERTON:  Your Honor, we think the timeline here is critical.  Our first argument that the complaint should be dismissed is the plaintiff does not allege any facts demonstrating that any of the challenged statements were false when made.  This timeline shows what the statements that the company -- that the plaintiff is challenging regarding its compliance with data privacy regulations.  The statements that plaintiff are challenging were made between April 30, 2020 and April 21, 2021.  But the complaint does not contain a single fact, your Honor, demonstrating any regulatory violation at the time any of those challenged statements were made.

The entire claim here is predicated on this red box. The entire claim is based on the Chinese regulators' direction to the company to update its practices to comply with new regulations, new regulations that went into effect on May 1, 2021, which was after each of the challenged misstatements.

THE COURT:  I have the picture.  I have the picture.

Okay.  Second page, tell me what that does.

MR. FUMERTON:  Your Honor, these are plaintiffs' allegations of falsity.  This shows that there's no dispute that the regulators' announcement only pertains to the May 1 regulation, the May 1, 2021 provisions which were after each of the challenged statements.

Plaintiff's assertion that the company was in

M7PQdigO

violation of prior regulations going back to April 2020 and earlier is pure speculation.  We submit that's nothing more than rank conjecture.  There are zero allegations in the complaint supporting this claim, and it's directly contradicted by the very reports that plaintiff refers to in the complaint which are set forth in slide 2.

Now, in their opposition brief, plaintiff claims that the May 10 announcement --

THE COURT:  Excuse me.  I'm not interested in argument now.  I'm just interested in understanding what page 2 will tell me that I can't get otherwise.

MR. FUMERTON:  Sure.  2 shows that the May 1 provisions only -- that the May 10 announcement by the Cyberspace Administration of China only referred to the May 1 regulations, the just-enacted May 1 regulations that were after each of the challenged misstatements.

THE COURT:  So why does Exhibit N tell me anything that should not be -- even here, Exhibit N is announcement on the illegal collection and use of personal information by 84 apps, including Tencent Mobile Manager.

Is that -- Mr. Christie, is that a government document?

MR. CHRISTIE:  Yes, your Honor.  Exhibit N makes our point, your Honor, and I would just like -- if you're looking at it right now, that's perfect.  Your Honor, this is the

M7PQdigO

Exhibit that comes out on May 10 and says that 360 DitiTech was found in violation of, your Honor, its numerous data privacy regulations, not just the one regulation Mr. Fumerton seems to say it is.  Your Honor, I can prove that to you right now.

THE COURT:  Not now.  I just want to know what this is for.

Why don't you proceed?  I think I'm going to be confused rather than helped by this document.  Let's take up the misrepresentations that are alleged to be false one at a time.  All right, Mr. Fumerton?

MR. FUMERTON:  Sure.

THE COURT:  The first one that's alleged is the form F for the year ended 2019.

MR. FUMERTON:  Yes.  Your Honor, if it's helpful, you can turn to slide 5.

THE COURT:  It's helpful to me if I go to the complaint.  That's the document I've got to deal with.  Not secondary material.

MR. FUMERTON:  That's paragraph 106.

THE COURT:  106, right.  And it alleges that:  We always obtain users consents for use of data and maintain them in machine-readable form only so that humans cannot review or intervene them.

What is the misrepresentation, Mr. Christie?

MR. CHRISTIE:  Your Honor, the part of the statement

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

that we're alleging is a misrepresentation is the part that's bold and italicized that appears above the language that your Honor just read.  If your Honor would like, I can read it to you now.

THE COURT:  I'll look at it.

"We are dedicated to privacy protection of our borrowers during our risk management process, and we adopt policies to make sure we always obtain users' consent for our use of data and enquire from other sources of their information."

Why does a general statement like that, more like boasting about one's company, constitute a misstatement?

MR. CHRISTIE:  Yes, your Honor.  So I've got a couple answers for you on that.

The one is, you know, statements that are worded as guarantees such as this where they say they always obtain --

THE COURT:  They say "We are dedicated to privacy protection."  It says, "We are dedicated to privacy protection."  That's not a guarantee.

MR. CHRISTIE:  Yes, your Honor, I don't disagree with you with respect to the language that says we are dedicated. There are other cases in the Second Circuit that have held similar language like that as puffery.  Our contention would be, your Honor, that it is what is said after that where they say that they adopt policies to make sure we always obtain

M7PQdigO

users' consent.  We know from the end of the class period that found to have not always obtained users' consent before collecting data --

THE COURT:  We only know that there was a violation of a regulation in May of 2021.  We don't know whether there was consent or not or whether there was misuse of beyond necessity.  So I don't know what basis you have to say that this is false.

MR. CHRISTIE:  Your Honor, during the class period, there's no suggestion in the complaint or anything that defendants have proffered to suggest that what the app was doing from the beginning of the class period here in April towards the end of the class period in May of 2021, where they were found to be in violation, that anything with the app had changed with respect to what their data collection practices were.  The only thing that we do know, your Honor, is that the increased regulation scrutiny occurred as they met with the defendants in April of 2021 and ordered them to rectify their data collection practices.

THE COURT:  That happened when?

MR. CHRISTIE:  April 29 of 2021.

THE COURT:  So but this allegation is April 30, 2020, a year earlier.

MR. CHRISTIE:  Yes, your Honor.  But, again, there's nothing in the complaint or defendant's motions to suggest that anything with the app, how it was operating, what date it was

using changed during the class period.  So what was in place at the time of the April 29 meeting was in place at the time of the April 30, 2020 statement and the 20 app.

THE COURT:  How do we know that?

MR. CHRISTIE:  Well, the absence of facts to the contrary, your Honor.  I mean, there is nothing in the record to suggest otherwise.

MR. FUMERTON:  Your Honor, if I may?

THE COURT:  Yeah.

MR. FUMERTON:  This is a 10(b) securities fraud claim.  As your Honor knows, it's subject to the PSLRA Rule 9(b).  It's plaintiff's burden to state with particularity exactly what statement was false and how it was false.  There is not a single fact in --

THE COURT:  I get that.  Just relax, Mr. Fumerton.

MR. FUMERTON:  Sure.  There's not a single fact in this complaint anywhere demonstrating the company ever failed to obtain users' consent prior to obtaining data.  The definition of consent in this regulatory scheme evolved from 2011 all the way to 2021.

Your Honor, if you just briefly, we've laid it out here in this presentation on slide 3.

THE COURT:  Mr. Fumerton, I really want to stick to the pleadings.

MR. FUMERTON:  Sure.

M7PQdigO

THE COURT: It's the pleadings and the sufficiency or lack of sufficiency that's in issue. I don't want to be diverted away from the pleadings.

MR. FUMERTON: Sure, your Honor, but --

THE COURT: So the question I'm asking, and I'm really asking this to Mr. Christie, is that how can a disclosure a year earlier from the regulatory action be a misstatement?

MR. CHRISTIE: Well, your Honor, I think the point there is that there's an admission at the end of the class period that the company was over collecting and even --

THE COURT: There's no admission. There's a newspaper report of an unnamed statement from the company, unnamed individual. That's hardly an admission.

MR. CHRISTIE: Yes, your Honor. I mean, we disagree with that. We think it is an admission because it's from a person in charge at the company.

But setting that aside, your Honor, you also have the Chinese government coming out with the May 10 bulletin which specifically says that the company had been engaging in multiple violations, including the provisions on the scope of necessary personal information, which we know Mr. Fumerton --

THE COURT: Slow down. Slow down. You're talking faster than I can understand.

MR. CHRISTIE: Sorry, your Honor. We know for a fact that they violated that, but we also know that they violated

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

the other violations including collect personal informal irrelevant to its services.

THE COURT:  How do we know that?

MR. CHRISTIE:  Your Honor, that's what the Chinese government found when they issued the May 10 bulletin.

THE COURT:  Where in the pleadings does it say that?

MR. CHRISTIE:  Your Honor, it says it pretty much throughout the pleading.  It says that based on the admission and based on --

THE COURT:  So where is the admission?

MR. CHRISTIE:  Sure, your Honor.  The admission is in numerous places in the complaint.  Paragraph 100 is the place where it comes in at the end of the class period.

THE COURT:  So that reads that a newspaper, major newspaper or publication in China reported that the app that we're talking about had been removed from mainstream application platforms.

And then it says, "The relevant person in charge at 360 DitiTech admitted that the removal was related to the illegal use of personal information."

First of all, we don't know who that person is.  We just have a hearsay statement from a newspaper that's unattributed.  And we don't know what is the illegality?  Was it the consent?  The lack of consent?  The extra use beyond the point of necessity because the regulations define a necessity?

I can't take stock of the admission.  It's not -- it's not of a nature that is other than the worst kind of hearsay, and it doesn't say anything to the point.

I have -- going back to the representation in paragraph 106 and 107, I have great trouble finding that that's false, and you have to allege that it's false and you have to allege a specific way that it violates a law, and you haven't.

We're down now to the next point, 108, an earnings call to stock analysts to review the first quarter earnings, and it says, "We adhere to the highest standard in compliance." Is that not an opinion?

MR. CHRISTIE:  Well, your Honor, I don't know that it is an opinion because it doesn't contain, you know, the language in the addition of an opinion statement that say things like "we think" or "we believe."  It just says that they always adhere to the higher standard of compliance.

THE COURT:  It's either puffery or an opinion or both.

I have the same problem with that -- the third item is a press release of June 2, 2000, talking about the company's competitive advantage in terms of regulatory compliance.  "in contrast of regulatory actions against other companies, collections and use of personal data, the company's core competency in data privacy and security technology reinforces company's competitive advantage."

The same thing.  It's a boast about yourself.

M7PQdigO

MR. CHRISTIE:  If I could, your Honor, just one point on that.  There's a couple of statements that are alleged in the complaint here that mention the company's competitive advantage over its competitors based on its supposedly superior data privacy collection capabilities.  And, your Honor, that's exactly what's at issue in the complaint here.

So, your Honor, if I'm an investor, and I am planning on investing in a company that does what 306 DigiTech does, and they tell me that their data collection is a competitive advantage over their competitors, I think that's exactly the type of thing that an investor would rely on when making an investment decision.

THE COURT:  It's the same kind of thing as my daddy could beat up your daddy.

MR. CHRISTIE:  But, your Honor, in the stock market, my daddy could beat up your daddy may very well be material to an investor who is making an investment decision.

THE COURT:  Not likely.  It is expected that each company would tout its own capabilities over others.  Again, it's puffery.  It's a statement of opinion.

Have I missed anything so far, Mr. Fumerton?

MR. FUMERTON:  No, your Honor.  And your Honor's conclusion is perfectly in line with the circuit's decision in *Singh* and *Pinduoduo*, where it held statements that were almost identical or inactionable puffery.

M7PQdigO

THE COURT:  S-I-N-G-H.

MR. CHRISTIE:  Your Honor, can I respond to the discussion of *Singh*?

THE COURT:  Yes.

MR. CHRISTIE:  Your Honor, *Singh* goes into perfect detail of why these statements would be actionable because the *Singh* case says -- it draws a line on puffery as to whether or not the statement was made confidently or it was made cautiously about whether or not the company at issue was currently following relevant regulations.

And, here, your Honor, this is the most confident statement you could have.  There's no compressing uncertainty by the company.  They're saying we have all of these ongoing -- even though there's a ongoing regulatory environment that's changing, we have a competitive advantage over our competitors when it comes to regulatory compliance.  Those kind of confidence statements *Singh* says are actionable.

THE COURT:  We know that the Chinese law protected privacy was on the book for a long period, since 2001.

MR. CHRISTIE:  For the class period.

THE COURT:  2001?

MR. CHRISTIE:  That's 2011, your Honor.  There's another law that deals with the exact same principles of data collection and data privacy and consent in 2016.  And then there's another one in the beginning of the class period right

M7PQdigO

a full month before in 2019, your Honor.

THE COURT:  A company can take consents from individuals that their data will be used in a proper manner, more or less defined, and because of different attitudes by the regulators, what is permissible in one period can be impermissible in a later period.  And without showing the changes in law, you assume that the law is the same.  You assume that the regulatory position is the same.  That's a large assumption from all that we know about China.

MR. CHRISTIE:  Yes, your Honor, though just looking at the complaint and what the complaint alleges with respect to what the regulations said, they're all on point.  And, your Honor, I mean, the guidance that happens at the end of the class period that Mr. Fumerton is relating to, all it does is clarify some of the information.  It's issued by the exact same regulators, and all it does is update some of the information about what or what isn't necessary.  It says nothing of consent.  And yet --

THE COURT:  Maybe the problem wasn't consent.  Maybe consents were had, and the information was used in ways that regulators now said were improper.  You don't know.  You have not really shown the violation, you don't -- other than the action of a regulator in general.  We don't know what it was in the company's use of the 306 Jietiao.  We don't know what it was in that use that offended the regulators.  *Singh* holds that

a general statement of compliance and optimism are not actionable.  A warning of risks that later emerge are not a misrepresentation.

We're down to 2 and 3, 2020 press release.  We will never collect date data without the user's consent.

Again there,'s no plausible basis to allege that users' consent was involved or not involved.  The regulation that you quote in the pleadings speaks of necessity.  And what is a necessary use of data and what is an unnecessary use of data is not explained.  It's not explained in the law, and it affects all that we think about in terms of these representations.

MR. CHRISTIE:  Your Honor, I would just amend that in one slight way, which is that the regulations that we cite in the complaint in paragraph 64 and 67 talk about consent as well and the requirement that the company obtain user consent for collecting information from them.

THE COURT:  Well, how do we know it didn't?

MR. CHRISTIE:  Well, your Honor, we know that they didn't because the Chinese government comes out with the May 10 bulletin and specifically cites collecting and using user personal information without user consent in the May 10 bulletin.  So we know that that's something that in doing its testing that the Chinese government found that 360 DitiTech had violated, your Honor.

THE COURT:  You start with Chinese law that you don't define or lay out in a period earlier than 2021.  The first date that you allege in 2021 is March 1, 2021.  And the allegation is in paragraph 87.

You say that in March 2021, Chinese regulators announced a new series of laws.

Well, that's troublesome to begin with for your case that there's new laws.

A new series of laws aimed at protecting customers' personal information from collection by mobile apps.

Now we don't know what personal information.  Some we know are necessary to anybody in the business of matching borrowers and lenders, as your client was.

MR. CHRISTIE:  Correct, your Honor.

THE COURT:  As your -- as the defendant was.  So some information clearly is properly used.  And then it says:  On March 12, 2021, Chinese regulators issued the provisions on the scope of necessary personal information for common types of mobile internet complications.

Now, that's not consent.  That's necessary use and what scope necessary use has.  So something that was perfectly okay in February 2021 can be a potential violation in March of 2021.  And that doesn't help your case at all with regard to every statement made before March of 2021.

MR. CHRISTIE:  I understand your Honor's point there,

M7PQdigO

but I just will note that the consent issue is still hanging out there where the only regulations that mention consent are ones that predate the class period, and the defendants' statements say that they were guaranteeing --

THE COURT:  You haven't set them out.

MR. CHRISTIE:  Yes, your Honor, we have, and that's in paragraphs 60.  It's beginning in paragraph 58, we talk about the first provisions on standardizing the internet information service market from 2011.  And then paragraph 59 is the 2016 law, the cybersecurity law, which specifically says that the company must obtain the information or its consent to use or collect such information.  And then beginning in January 25, 2019 --

THE COURT:  Let's stop.  In 58, the last sentence says:  "Article 11 of these provisions prohibits internet service providers from collecting personally identifiable information or providing such information to third parties without the user's consent."

MR. CHRISTIE:  Correct.

THE COURT:  Now, we know that the nature of the business was to have some use.  Data collection was important, and a degree of use of that consent in order to show credibility and suitability and other matters like that was absolutely critical.

MR. CHRISTIE:  Sure, your Honor, but --

THE COURT:  What this law is, and we don't know the law because you've not set it out, is that it's not from collecting personal identifiable information that's wrong, and it's not providing such information to third parties that's wrong.  It's the scope of use.  We know that from later regulations, and I don't know why Article 11 would be different.  Is there anywhere here that you tell us what Article 11 is?

MR. CHRISTIE:  Yes, your Honor.  I think the part we do say what is relevant related to Article 11 is what is permitted and what they prohibited, and the one again I'll go back to is user consent.

THE COURT:  In one of your exhibits, you set out Article 11.

MR. CHRISTIE:  Your Honor, we didn't include any exhibits with our complaint.  This was taken straight from the regulations themselves and we put them into the complaint as allegations.  They're throughout paragraph 58 through -- it's 67, your Honor, where we're going through a fulsome discussion of all the different regulations.

Your Honor, I'll note that all of them pertain to obtaining user consent as well.  That's where those appear, and we set out exactly why when the Cyber Administration of China in May 2010 found that they didn't obtain, consent that they were in violation of all of these rules, not just the one that

M7PQdigO

happened halfway through the class period, your Honor.

THE COURT:  So we don't know, Mr. Christie, what it was that the company was doing that in the opinion of the regulators violated the law.

MR. CHRISTIE:  Correct.

THE COURT:  Was it a lack of consent or was it a scope of use that was found to be unnecessary in the business of DigiTech?

MR. CHRISTIE:  It's both, your Honor.

THE COURT:  I'm putting this question to you.

MR. CHRISTIE:  Yes, your Honor.

THE COURT:  There are a few possibilities:  One innocent and one guilty.  Is that a sufficient pleading?

MR. CHRISTIE:  Your Honor, I think, taking all inferences in favor of the plaintiffs and reading -- taking the complaint's allegations as true, I think we've met that bar, your Honor.

THE COURT:  Doesn't the law require a particularized statement of falsity?

MR. CHRISTIE:  Yes, your Honor, and I think all of defendants' statements guaranteeing that they obtained user consent in light of the fact that they were then found to have not obtained user consent and the admission at the end --

THE COURT:  They didn't find that.  They didn't find that.  That's not what the pleading said.  And there's no basis

M7PQdigO

to say that the regulators found one thing over another.  It's a necessity that's the keyword in the regulation.

Mr. Fumerton, what do you think?

MR. FUMERTON:  Your Honor, that's absolutely right, and it's clear from the paragraphs in the complaint --

THE COURT:  In what respect am I absolutely right?

MR. FUMERTON:  What's that?

Your Honor, the definitions of consent and necessity continue to evolve over that ten-year period.  You can get that from the complaint and the statutes that are referenced. Again, what was valid consent in 2011 and 2016 and 2019 wasn't necessarily valid consent in 2021.  We know that.  We know that because the statutes continue to define.

THE COURT:  Can you take me through them?

MR. FUMERTON:  Sure.  So if you look at paragraph -- again, your Honor, the demonstrative is useful because we set forth the paragraphs, and I'll alert you to them.

THE COURT:  I have the demonstrative.  Use that for your argument.  I want to know in the pleadings.

MR. FUMERTON:  Sure.  If you look at starting with paragraph 61 of the complaint, 60 and 61, it refers to a January 2019 Cyberspace Administration of China announcement which clarified both the principles of necessity and consent.

I've laid this out in Exhibit F to my declaration which plaintiff does not challenge.  This is a regulation

M7PQdigO

that's specifically referenced.  In that regulation, it said you no longer can use default.  You no longer can stop installation of the app if the user doesn't consent.  It defined what's permissible consent.  What's not permissible consent.

THE COURT:  What does it say?

MR. FUMERTON:  It says you can no longer do those things, right?  And there's no facts in the complaint alleging --

THE COURT:  You could no longer do what?

MR. FUMERTON:  You could no longer -- if you go to Exhibit F at 2, Exhibit F to my declaration at 2.  It's 47-6.

THE COURT:  Where in your demonstrative is it?

MR. FUMERTON:  In the demonstrative, it's slide 3. It's all excerpted here.  It's the third box down.

THE COURT:  Yes.

MR. FUMERTON:  And you'll see there that it prohibits -- it states that:  Personal information subjects shall independently choose consents.  They shall not force the users to make authorization in the forms of default, bundling, stopping installation and use, et cetera.

And the details here, your Honor, are important.  It just shows that this is an evolving scheme.

THE COURT:  Just a minute.  Let me read it.

The main point here that I take is that the act that's

forbidden is collection of personal information not related to the services provided.  So it's not so clear what it is that you can use the information for.

MR. FUMERTON:  I think that's exactly right, your Honor, and I think both the necessity, I think it also does relate to consent which, again, continues to evolve, we see in November 2019.  For this you can go to paragraph 64 of the complaint.  Again, the regulators are again clarifying what is acceptable consent, what is not, right?  It identifies six practices that are no longer acceptable in consent.  All of this just underscores how evolving this regime was and how there are no facts in the complaint that we had any existing violation.  And, your Honor, we warned of this.  We specifically warned that this could happen.

THE COURT:  I'll get to that.

MR. FUMERTON:  Okay.  Your take, Mr. Christie?

MR. CHRISTIE:  Your Honor, I think that the way that Mr. Fumerton has framed this as this ever-evolving thing cannot change the simple fact that the company, if true, that it did, you know, perform the violations that are mentioned here by the Chinese government, that that would have violated all, all of the regulations that are in place here; not just the one that Mr. Fumerton points to here.  It's all of them, your Honor.  They all say you have to obtain user consent.  The Chinese government said --

THE COURT:  No, they said they can't use it that beyond which is necessary for the practice of business and the purpose for which consent was given.  They don't say not getting consent.

MR. FUMERTON:  Your Honor, we submit that's a bare legal conclusion.  There are no facts supporting that.  Look at what's alleged in the complaint.  There's a 2019 crackdown that's alleged in the complaint.  There's no allegation that the company was subject to a single regulatory violation.  There's no allegation that a regulator ever found this company to be in violation of anything until May 10 of 2021, and that regulator specifically said the only regulation that's at issue here that's implicated is the May 1, 2021 regulation after each of the challenged misstatements.

THE COURT:  I agree with Mr. Fumerton.

In the case of *Rombach v. Chang* and *Hirsch v. Arthur Anderson*, one is a 2004 and the other a 1995 decision from the Second Circuit, make the point.  The specific statement of falsity must be identified and it must be demonstrated why it is false.  And alleging fraud in broad conclusory terms is insufficient to survive a motion to dismiss.  It is never a clear statement of exactly what it is that was the violation, and it is clear from what Mr. Fumerton says and what the documents and exhibits and the allegations say that the regulatories were evolving.  Regulations were evolving.  The

regulatory practices were evolving.

For that reason, I can't find that any statement made before April 21, 2021 can be false.  And that rules out the 2019 form 20-F, the May 28, 2019 earnings call, the June 2, 2020 press release, the June 3, 2020 press release, the form F of April 21, 2020, and the November 19, 2020.  I find that those allegations of false representation are not legally sufficient.

Now, let's go to the April 21, 2021 form 20-F.  And the allegation is that the complaint fails to allege the company's warnings in the same document.  It goes on to say that -- what you haven't said is what is said at page 23 of that form F; that uncertainty as to the interpretation and application of such laws or in a manner inconsistent with our current policies and practices of which we are aware and that actual or perceived noncompliance might result in warnings and closedowns.  The company cannot assure that our system and technical measures would be considered sufficient.

Doesn't that show a bespeaks caution kind of statement that causes the reader to look at the statement of the laws and the company's practices and be concerned that the regulations might change and the regulators might change or might change their attitudes?

MR. CHRISTIE:  Yes, your Honor, in some instances it can do that.  What I would argue here is that based on the

other statements that the defendants made, the confident misstatements about the fact that the company was in compliance would have counterbalanced the curative effect of that warning, your Honor.

THE COURT:  The company says it's in compliance. Nothing has been done by the regulator to show it's not in compliance.  Nothing's been shut down.  Nothing's been removed. And the company is stating in the very same document that you claim is a misstatement that bespeaks caution, the statement that I read out to you.

MR. CHRISTIE:  Your Honor, I hear your point.  My counterpoint to that would be that at the time you have the defendants, they're in violation of those regulations, so their warnings are not exactly helpful to an investor who is also being told on the other hand that the very same document firmly and confidently that were dedicated to privacy protection of our borrowers and we always obtain user consent to use their data.  In the same document they also say:  Large volumes of high quality data is --

THE COURT:  When you read something and you want me to pay attention to it, don't speed up.  The reporter can't get it.  Read it again slowly.

MR. CHRISTIE:  Sorry, your Honor.  It also says in the 20-F:  Large volumes of high-quality data is a key factor differentiating online finance platforms.  We have gained a

considerable competitive advantage with our proprietary data collection processing and analyzing capabilities.

So, your Honor, on one hand, they're --

THE COURT:  Wouldn't a lender want to have some depth of knowledge as to the creditworthiness of an applicant?

MR. CHRISTIE:  Sure, your Honor, that's understandable.

THE COURT:  And isn't that a competitive of an advantage.

MR. CHRISTIE:  Not if they're collecting data that they're not supposed to be collecting, your Honor.

THE COURT:  That we don't know.  We don't know why it was considered improper.  So May 21, 2021, I think --

MR. FUMERTON:  Your Honor, it's April 21, 2021, so it falls in the same category.  It's before the May 1 regulation came into effect.

THE COURT:  I'm commenting that at a certain date, I think it's May 21, the company received a notice of violation and expresses confidence on May 27 that it can overcome this problem.  So why is that false?

MR. CHRISTIE:  Your Honor, so there's two additional reasons now that we're in this part of class period that would inform the falsity of that statement.

The first one is that on April 29, the Chinese government and regulators called in 360 DitiTech for a meeting

and issued rectification requirements, one of which included relating to the data collection practices.  So that's one, your Honor.

The second is now that we're in late May, the 27th, you already have the Chinese government having come out and said that the company was found to be in violation of numerous regulations, including over-collection of information that's irrelevant to its services, as well as collecting information without user consent.

So, your Honor, you have the extra layer now where the company has already been found to be in violation of it, and yet they still had a few days to rectify the problems.  This was during the pendency of that time, and they're making a confident statement about the fact.  And, your Honor, I think a reasonable investor could have read this statement to say they fixed the problem that they've been accused of, and there's not going to be any further issues here.  That's what they allege. I'm not done --

THE COURT:  You're experienced lawyer.  You come upon a condition where your client asks what are the chances?  And you answer, "I think we can overcome our problems.  I think we'll win."  And it turns out you can't overcome the problems and you lose.  Have you made a false statement?

MR. CHRISTIE:  If you're in possession of information that contradicts what you said, your Honor, I think you have,

and I think it's reasonable to assume that by this point in time, the defendants would have, or should have at the very least, known whether or not they were still over-collecting user data without user consent.

THE COURT:  So we know that the company thinks -- the regulators thinks that the company has been over-collecting.

MR. CHRISTIE:  Correct.

THE COURT:  The company believes it has not been over-collecting and expresses confidence that it can persuade the regulators not to remove the app.  Where is the violation?  Where is the falsity?  It's a statement of confidence.  It's an opinion.

MR. CHRISTIE:  Your Honor, when they say:  "We have consistently held our operations to the highest of compliance standards," I think it's reasonable to think that an investor wouldn't have thought that was opinion, but that was a statement of fact that the company was at that time in compliance and had met the rectification requirements of Chinese government, and that there would be no further issues with --

MR. FUMERTON:  Your Honor --

THE COURT:  I disagree.  I can't get that reasoning.

Look, every lawyer knows this.  A case comes in.  It wouldn't come in to you or to Mr. Fumerton unless there was a problem that couldn't be solved by the executive themselves.

And if a lawyer was overwhelmed by the problem and never expressed confidence that he can overcome it, what kind of lawyer would he be?  How much business would he be able get once he starts doing that?

The same thing with this company.  I gather from your allegations this was an aggressive company, successful in a business that required speed and efficiency and lots of use of data so loans could be made in instances where other companies would not be able to react.  The first lender that accepts a loan is the lender that's likely to get the business.  So speed and accuracy and data are important, and 360 DitiTech is trying to do that.

Now, it's possible, at least the Chinese regulators thought, that they were overdoing it; that they collected data not for this particular use but that it was used in different ways, or that the lenders they gave this information to was using the data in different ways.  We don't know.  We don't know what the concerns of the regulators were.  And we do accept -- at least I do -- that this was an evolving type of situation, both in the expression of the law and the clarification of the law and the application of the regulations.

So I hold that these were not false statements; that the pleading has not sufficiently alleged falsity with the particularity required by the law.  Do you think an amendment

M7PQdigO

could cure this?

MR. CHRISTIE:  Your Honor, I do believe an amendment could cure this.  We have continued our investigation into the company.  I believe with some time, we would be able to find potentially a confidential witness who may be able to provide the level of clarity that your Honor is looking for with respect to the --

THE COURT:  How much time should I give you for such discovery?

MR. CHRISTIE:  Well, your Honor, typically if it was a United States company, I would say 30 days, but there's a number of, you know, problems with contacting people in China, including their willingness to speak to us.  I would ask for 45 days, your Honor, so we can make sure we have our ducks in a row by that time.  And if we're incapable of finding any other witnesses, we can inform the Court of our notice of not --

THE COURT:  I'll give you 60 days.

MR. CHRISTIE:  Thank you, your Honor.  That's very generous of you.

THE COURT:  Shall we deal with the other issues?  I can speak quickly about them.

MR. CHRISTIE:  Sure, your Honor.  That would be helpful.

THE COURT:  The lost causation department.  I think it is not sufficient just to say that an event happened, and the

M7PQdigO

stock dropped.  What else was going on in the market?  What companies were comparable?  Was this an exception to what was going on in the market or was this a general trend?  On April 10, you say the stock dropped 4.98 percent, but on the NASDAQ you could have that spread between buy and sell and still not be considered a loss.

Now, the more significant stock drop was in aftermath of July 8, 2021 when a 21 percent of decline closed.  What else was going on in the market to allow us to make a better inference of lost causation?

On scienter, it's just not enough with the individual defendants, other than Haisheng Wu, to say they were in control or to make them responsible in any way for any misrepresentations.  You'll need a lot more allegations about each individual.  Even a CFO interested in the revenues and expenses of a business may not know about this collection of data and the over-collection of data.

So except as to Wu, I think you're going to have a very difficult case with respect to the others.  And since you have so much difficulty in getting them and so much expense in getting them, you might consider dropping them.

As to Wu, Mr. Fumerton, could you provide his email address if you can get it?

MR. FUMERTON:  Absolutely, your Honor.

THE COURT:  And if you want to make a motion to permit

service, you might want to wait until after you plead and Mr. Fumerton makes another motion.  But at some point, I'll give you the relief you want.

MR. CHRISTIE:  Thank you, your Honor.

THE COURT:  With regard to the exhibits from both sides, I think you should strictly limit your exhibits to that which I would take into consideration on a Rule 12 motion.

What have I left out, Mr. Fumerton, anything?

MR. FUMERTON:  Nothing from defendant, your Honor.

THE COURT:  All right.  I think it's necessary to give Mr. Christie time to amend.  I've been cautioned recently about not giving opportunity to amend, and I needn't do it here.

MR. FUMERTON:  Your Honor, we note that plaintiff has had more than a year since the stock price dropped to investigate to try to find confidential witnesses, so we express, obviously, skepticism that anything will change, but we understand your Honor's ruling.

THE COURT:  Okay.  I don't know how you get information in that way, but try.

Okay.  Thank you very much.  We'll have a summary order issuing following up this decision, so it will be on the record.  And if you decide to appeal and give up your right to amend, you'll be able to do that.

MR. CHRISTIE:  Thank you, your Honor.  Appreciate your time.

M7PQdigO

THE COURT:  You'll have to give up your right to amend because otherwise the order won't be filed.  I'm going to return the demonstrative.

(Adjourned)